703 A.2d 984

MARIE A. JOHNSON, PLAINTIFF–APPELLANT, v. AMERICAN HOMESTEAD MORTGAGE CORPORATION, ANNE E. CLARK, AND RICHARD J. ARBOGAST, DEFENDANTS, AND PARK REAL ESTATE, DONALD A. FARINELLA AND BRIEN DANKO, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted December 9, 1997—Decided December 24, 1997.

430

Before Judges PRESSLER, CONLEY and CARCHMAN.

*Scangarella & Feeney,* attorneys for respondent Brien Danko (*David C. Dixon,* on the brief).

*Bongiovanni, Collins & Warden,* attorneys for appellant (*Anthony P. Caivano,* on the brief).

*Thomas Melani,* attorney for respondents Park Real Estate and Donald A. Farinella, relies on the brief filed by respondent Brien Danko.

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

This is a real estate appraiser malpractice case in which the jury found defendant Donald A. Farinella sixty percent responsible and defendant Brien Danko forty percent responsible for the economic loss sustained by plaintiff Marie A. Johnson for which it returned a total verdict in her favor of $17,000. Plaintiff appeals, asserting that the trial judge erred in allowing defendants a *pro tanto* credit of $15,000, the amount of the pretrial settlement plaintiff made with defendant American Homestead Mortgage Corporation (AHMC). She also claims that the jury's damages verdict was against the weight of the evidence and that she was entitled to an additur. While we agree that the judge erred in allowing the credit, we are satisfied that the jury's damages verdict is supported by the evidence and must be affirmed. We therefore remand to the trial court for modification of the final judgment by adding thereto the additional sum of $15,000, to be paid by the defendants in accordance with their respective liability allocations.

This controversy arises out of a so-called reverse mortgage loan entered into between plaintiff and defendant AHMC in September 1986. Plaintiff, recently widowed and burdened by substantial debt, owned her home in Livingston free of all liens. In order to obtain funds, both to pay off the debt and to provide her with an income, she entered into a mortgage arrangement with AHMC whereby she granted it a first mortgage on her property in exchange for a monthly payment to her of $700. The sums so advanced were to be repaid to AHMC on sale of the premises together with interest at the rate of eleven percent and all of the appreciation in the value of the property between the date of the execution of the mortgage and the date of the sale.[1] In order to determine the value of the property as of the date of the mortgage, the base-line value, AHMC retained the services of defendant Park Real Estate, a real estate appraisal company owned by defendant Farinella, who also served as the supervising appraiser. The actual appraisal of plaintiff's home was done by Park's employee, defendant Danko. Danko's appraisal, evaluating the then value of the property at $172,000, was reviewed and approved by Farinella.

Plaintiff decided to sell the property in April 1990, listing it for sale at $245,000. Pursuant to her agreement with AHMC, she advised it of her intention to sell, and AHMC initiated the appraisal procedure therein provided for, namely, the selection by each party of an appraiser from a predetermined list. Plaintiff selected Park. AHMC selected an appraiser having no prior

---

[1] We do not consider, because not here raised, whether the full appreciation component of the consideration would withstand either a public policy or consumer fraud defense. We also note that because plaintiff required a large amount of funds at the outset to pay bills, AHMC financed an initial payment to her of $35,000 to be paid back on an amortized basis out of the $700 monthly payment, leaving her with an actual monthly receipt of less than $5. It is not altogether clear, but it appears that plaintiff may have been obligated to pay 11% interest on the full $35,000 as well as the interest thereon included in the monthly amortization payment.

connection with the property.[2] Park's appraisal, performed by Farinella, valued the property at $220,000, while AHMC's appraiser valued it at $215,000. AHMC then averaged the two appraisals and advised plaintiff that for purposes of her appreciation-payment obligation, the present value was $217,500. Plaintiff sold the property about two months later for $205,000. AHMC demanded, as the appreciation-payment, the sum of $45,500, that is, the difference between the base-line appraisal of $172,000 and the sale-date appraisal of $217,500.[3] Plaintiff paid it that sum at closing out of the closing proceeds. This action for the recovery of that money against AHMC, its individually named employees, Park, Farinella, and Danko ensued, all of them alleged to be joint and several tortfeasors on theories of fraud, negligence and professional malpractice.

Suffice it to say that at the time trial commenced, the only remaining defendants were Farinella and Danko, and the only claim remaining against them was based on professional malpractice. AHMC was out of the case, having settled with plaintiff before trial in the amount of $15,000. All claims against its employees individually had been dismissed, and, as trial opened, all cross-claims for contribution against the settling and dismissed defendants were expressly withdrawn.

The basis of the professional malpractice claim was the assertion that Danko had made material errors in the base-line appraisal, notably a seriously erroneous calculation of the square footage

---

[2] Plaintiff's reason for choosing Park was her belief that since it had provided a low base-line appraisal, it would provide a concomitantly low sales-date appraisal.

[3] The agreement between plaintiff and AHMC contained a provision whereby AHMC agreed to accept the actual sales price as the sale-date value provided it first had the opportunity to review the matter and then opted to give its approval. Plaintiff had not sought its approval, and AHMC insisted on the appraised value rather than the sales price. It appears that its eventual $15,000 settlement represents the difference between the actual sales price and plaintiff's 1990 appraisal.

of the house and a reliance on comparable sales without adjustments for those value-enhancing features of plaintiff's house that the comparables lacked. It was the opinion of plaintiff's real estate expert that the true value of the property in 1986 was $220,000 and that Danko's errors accounted for his appraisal at $48,000 less. Obviously, if the true base-line value were the amount opined by plaintiff's expert, there would have been no appreciation between 1986 and 1990, and plaintiff would have had no appreciation-payment obligation to AHMC. She therefore sought damages in the full amount of the appreciation value she had paid at closing. For present purposes, it is sufficient to note that the trial proofs supported plaintiff's claim that both Danko and Farinella had erred in the base-line appraisal and that their errors resulted from their deviation from the applicable standards of appraisal practice. The evidence also supports the jury's allocation of fault between them. Neither defendant has, moreover, cross appealed either from the jury's liability verdict or from its allocation of fault.

The gravamen of this appeal arose early in trial during the course of plaintiff's direct examination. The issues were first, whether defendants would be entitled to a credit for the AHMC settlement and second, what, if anything, the jury was to know about it. With respect to the first question, the judge ruled that a *pro tanto* credit was appropriate and that defendants were, therefore, entitled to a reduction in the amount of any damages awarded against them in the amount of $15,000. At that point, the attorneys stipulated that the jury would be told of the fact and amount of the settlement, that the settlement was made without any finding or admission of AHMC's liability, and that the amount of the settlement should be deducted from the damages to which the jury would otherwise find plaintiff entitled. Plaintiff's attorney then stipulated that the maximum amount of damages that could be found in plaintiff's favor was $30,500, that is, the payment she made to AHMC less the AHMC settlement. The case was thereafter tried in accordance with those rulings and stipulations.

 We address first the question of the credit. We note first the inapplicability of the collateral source statute, *N.J.S.A.* 2A:15–97. First, that statute, by its own terms, is limited to "civil actions for personal injury or death." This is patently neither. But even if it were, the statute would not apply. As the Supreme Court made abundantly clear in *Kiss v. Jacob*, 138 *N.J.* 278, 281–283, 650 *A.*2d 336 (1994), the proceeds of a settlement a plaintiff makes with a named defendant who is not found to be liable do not constitute benefits required by the statute to be deducted from the damages verdict.

 In view of the inapplicability of the collateral source statute, the question then remains as to how those settlement proceeds are to be treated *vis-a-vis* the adjudicated tortfeasors. The answer, we think, is plain and well settled by the case law construing the respective obligations of tortfeasors, both alleged and adjudicated, under the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to 5.8. In sum, as first articulated by *Rogers v. Spady*, 147 *N.J.Super.* 274, 277, 371 *A.*2d 285 (App.Div.1977), the effect of the Comparative Negligence Law was to replace the former *pro rata* liability of joint tortfeasors under the Joint Tortfeasors Contribution Law, former *N.J.S.A.* 2A:53A–1, with the obligation of each tortfeasor to pay damages in accordance with its own adjudicated percentage of fault. A necessary corollary of this scheme is to deny to comparative-negligence joint tortfeasors a reduction of their liability based on a plaintiff's pretrial settlement with a defendant who is never found to be liable at all. Thus, under the comparative-negligence scheme, a plaintiff is entitled to retain the proceeds of the pretrial settlement as well as the full jury verdict as allocated among all other defendants. In this respect, as *Rogers* pointed out, the comparative-negligence scheme differs from the former Joint Tortfeasors Contribution Law, as construed by *Theobald v. Angelos*, 44 *N.J.* 228, 208 *A.*2d 129 (1965), under which the non-settling defendants were entitled to a *pro tanto* credit for the proceeds of the settlement made by

plaintiff with the settling defendant whose liability was never adjudicated.

The rationale of *Rogers v. Spady, supra,* has been consistently reaffirmed and adhered to. *See, e.g., Young v. Latta,* 123 *N.J.* 584, 592, 589 *A.*2d 1020 (1991). *See also Kiss v. Jacob, supra,* 138 *N.J.* at 283–284, 650 *A.*2d 336; *Granduke v. Lembesis,* 256 *N.J.Super.* 546, 552, 607 *A.*2d 988 (App.Div.1992). Thus, unless the settling defendant's percentage of liability is adjudicated at trial, there is simply no right in the adjudicated tortfeasors to a reduction of their own separately-allocated responsibility for the verdict. We are aware that the percentage of fault of a settling defendant is subject to allocation at trial, but only if the settling defendant's liability is a trial issue either as the result of a cross-claim or because it is tried on notice to plaintiff. *See Young v. Latta, supra; R.* 4:7–5(c), as amended effective September 1, 1992. Here, the cross-claim was expressly withdrawn, AHMC's liability was not a trial issue and, therefore, no allocation of negligence was made against it. In these circumstances, each of the non-settling defendants was liable for his full allocated percentage of plaintiff's damages without receiving credit for the settlement.

 Finally, we are satisfied that the rule of *Rogers v. Spady, supra,* applies even though the liability theories as against the various defendants differed. We think it plain that the rule applies to every multiple defendant case in which a comparative negligence allocation among them is required to be made. *See, e.g., Blazovic v. Andrich,* 124 *N.J.* 90, 590 *A.*2d 222 (1991) (allocation between negligent and intentional wrongdoers); *Dunn v. Praiss,* 139 *N.J.* 564, 576–578, 656 *A.*2d 413 (1995) (allocation between co-defendants where one is sued in negligence and the other for breach of contract). *See also Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 608–609, 691 *A.*2d 350 (1997); *Giri v. Rutgers Cas. Ins. Co.,* 273 *N.J.Super.* 340, 350–352, 641 *A.*2d 1112 (App.Div.), *certif. denied,* 139 *N.J.* 185, 652 *A.*2d 174 (1994). Nor have we any doubt that had AHMC not settled, its percentage of

fault, based on the theories of liability pleaded against it, would have required allocation.

■ We deal now with the damages issue. Plaintiff argues that if there was liability at all, a damages verdict in the full amount of her claim was required to be returned. We disagree. The measure of damages here was based on the true base-line value of the property. Plaintiff was entitled to the $45,500 she paid AHMC at closing less the sale-date value minus the base-line value. Her damages theory was that the true base-line value was $220,000, exactly the same as the highest sale-date appraisal, and hence that no appreciation payment was due at all.

We agree, however, with the court's perception that the $220,-000 true base-line valuation provided the maximum limit of plaintiff's recovery, but that the jury was not obliged to accept it. Clearly, that was so. The $220,000 base-line figure was testified to by plaintiff's expert as a matter of his reasoned opinion. But that opinion obviously did not bind the jury. *Middlesex County v. Clearwater Village, Inc.,* 163 *N.J.Super.* 166, 173–174, 394 *A.*2d 390 (App.Div.1978), *certif. denied,* 79 *N.J.* 483, 401 *A.*2d 239 (1979). There was evidence from defendant's expert, Danko himself, that would have permitted the jury to ascribe a lower base-line value. Thus, it could have accepted Danko's opinion that the property had appreciated by fifteen percent in the interim between 1986 and 1990 and worked backward from the 1990 value to arrive at a base-line value. It could also have found that there was no substantial appreciation during the interim, as plaintiff asserted, and therefore fixed the base-line at the 1990 sales price. Either of these theories would have produced approximately the damages verdict the jury arrived at, as would its acceptance only in part of plaintiff's expert's rationale for his base-line evaluation. We cannot second-guess the jury. We defer to its verdict so long as, as here, it is reasonably supported by the evidence. *See R.* 2:11–3(e)(1)(B).

■ We make this additional observation. Even if the deduction for the settlement had been appropriate, we think it would

have been far preferable for the jury not to have been advised of the settlement at all, to have returned what it found to have been the entire damage sustained by plaintiff, and for the judge then to have molded the verdict accordingly. This is, indeed, the procedure prescribed by *N.J.S.A.* 2A:15–97 for dealing with deductible collateral-source benefits. Nevertheless we are satisfied that plaintiff was not prejudiced by the procedure actually employed. First, plaintiff's counsel requested it. More significantly, we have no doubt from this record that the jury well understood that it was to fix the total damages and then subtract the $15,000 credit. It appears clear that it in fact did so. Under these circumstances, the error made by the trial judge can be easily rectified by amending the order for judgment by increasing total damages to $32,000 and apportioning that sum in the 60/40 ratio as allocated by the jury.

We remand for modification of the judgment in accordance with this opinion. In all other respects, the judgment is affirmed.